**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK**
_____

**MARGARITA COLON,**

                                **Plaintiff,**

  vs.                                              **1:15-CV-651
                                                           (MAD/DJS)**

**SABIC INNOVATIVE PLASTICS US, LLC;
CONCERTA HEALTH SERVICES, INC.; DONNA
GUTTMAN,** *individually and in their official
capacities and as aiders and abettors*; **and SUZANNE
OWENS,** *individually and in their official capacities
and as aiders and abettors*,

                                **Defendants.**
_____

**APPEARANCES:**                               **OF COUNSEL:**

**OFFICE OF MATTHEW S. PORGES**       **MATTHEW S. PORGES, ESQ.**
641 President Street – Suite 205
Brooklyn, New York 11215-1186
Attorneys for Plaintiff

**BOND, SCHOENECK & KING, PLLC**     **NICHOLAS J. D'AMBROSIO, JR., ESQ.**
22 Corporate Woods, Suite 501                 **MICHAEL D. BILLOK, ESQ.**
Albany, New York 12211
Attorneys for Defendants SABIC Innovative
Plastics US, LLC and Suzanne Owens

**JACKSON LEWIS P.C.**                           **GREG A. RIOLO, ESQ.**
44 South Broadway                                **KRISTI RICH WINTERS, ESQ.**
14th Floor
White Plains, New York 10601
Attorneys for Defendants Concentra Health
Services, Inc. and Donna Guttman

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I. INTRODUCTION

Plaintiff initiated this action against Defendants on May 27, 2015.  *See* Dkt. No. 1.  In her complaint, Plaintiff alleges disability and pregnancy discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), the Americans with Disabilities Act ("ADA"), and the New York State Human Rights Law ("NYSHRL"); retaliation in violation of Title VII, the ADA, and the NYSHRL; interference and retaliation in violation of the Family and Medical Leave Act ("FMLA"); and individual liability under the FMLA and NYSHRL against Defendants Guttman and Owens.  *See id.*

Currently before the Court are Defendants' motions for summary judgment and Plaintiff's opposition thereto.

## II. BACKGROUND

Defendant Sabic Innovative Plastics ("Sabic") is a corporation doing business in new York State, which has a facility at 1 Noryl Avenue, Selkirk, New York (the "Selkirk site").  *See* Dkt. No. 55-1 at ¶ 1.  Defendant Concentra was a health care services company that provided health care services for other companies.  *See id.* at ¶ 2; Dkt. No. 55-2 at ¶ 1.  On October 25, 2012, Sabic contracted with Concentra for Concentra to provide "medical office services" at the Selkirk site through the end of 2012.  *See* Dkt. No. 55-1 at ¶ 3.  On December 13, 2012, Sabic contracted with Concentra for Concentra to provide medical services for the first six months of 2013.  *See id.* at ¶ 4.

Pursuant to Sabic's contracts with Concentra, in October of 2012, Concentra hired Plaintiff as a medical assistant at Sabic's site in Selkirk.  *See id.* at ¶ 6.  Concentra invoiced Sabic for Plaintiff's hours at the end of each month from October 2012 through July 2013.  *See id.* at ¶ 7.

As the medical assistant, Plaintiff's job duties included doing measurements and tests on Sabic employees before they would see the doctor on-site, Dr. Pozniakas, when he as at the Selkirk site two days per week. *See* Dkt. No. 55-1 at ¶ 18. During the three days per week the doctor was not at the Selkirk site, Plaintiff would input medical chart information into computers. *See id.*

Plaintiff was pregnant when she was hired by Concentra and began working at the Selkirk site in October 2012. *See id.* at ¶ 25. Plaintiff did not disclose her pregnancy to Defendants until November or December of 2012. *See id.*

When Plaintiff would request paid time off, she would email two Concentra employees, Judy Harris and Defendant Donna Guttman. *See id.* at ¶ 26. When Plaintiff sought to take time off for the birth of her son in January 2013, she emailed Harris and Defendant Guttman, indicating that, as of January 4, 2013, she would be out of work. *See id.* at ¶ 27. For the time period of January 4 through February 15, 2013, Plaintiff received disability benefits through Concentra. *See id.* at ¶ 28. On February 19, 2013, Plaintiff returned to work. *See id.* at ¶ 29.

In the six weeks from April 23, 2013 to June 4, 2013, Plaintiff had missed all or part of the workday on nine occasions. *See* Dkt. No. 55-1 at ¶ 50. Specifically, Plaintiff's absences from work during this time period were as follows: April 23 (full day); April 26 (worked a partial day, 8:00-12:00); April 30 (worked a partial day, 9:00-1:00); May 2 (worked a partial day, 8:00-1:00); May 13 (full day); May 16 (worked a partial day, 6:38-12:32); May 22 (worked a partial day, 7:00-9:30, 12:50-4:00); May 24 (full day); and May 31 (full day). *See id.* at ¶¶ 36-49. On June 5, 2013, Suzanne Owens called Donna Guttman to discuss issues she had with Plaintiff not completing tasks as required. *See id.* at ¶ 51. Specifically, Owens related issues with Plaintiff's absences, misfiled and incorrectly completed charts, and spending time on her cell phone talking

3

or texting. *See id.* Following Owens' call, Guttman wrote a note in Plaintiff's file memorializing the call and the issues that Owens had related. *See id.* at ¶ 52.

Plaintiff's telephone records indicate that, while clocked in on June 3-5, 2013, Plaintiff made and received repeated calls on her cellular phone. *See id.* at ¶ 55. Telephone records further show that, while clocked in on June 5, 2013, the date that Owens called Guttman about Plaintiff's phone use, Plaintiff sent 144 text messages (a number that does not include the text messages Plaintiff received and may have read). *See id.* at ¶ 56.

After June 5, 2013, Plaintiff had additional days where she was absent from work for various reasons. Specifically, Plaintiff was absent on the following dates: June 7, 2013 (worked a partial day, 7:40-12:15); June 13, 2013 (full day); June 18 and 19, 2013 (full days); June 24 and 25, 2013 (full days); June 27, 2013 (worked a partial day, 7:00-10:00, 1:00-3:30); July 3, 2013 (worked a partial day, 6:54-10:09); July 5, 2013 (worked a partial day, 8:00-11:37); July 8, 2013 (worked a partial day, 8:00-1:27); July 10, 11 and 12, 2013 (full days); July 17, 2013 (full day); July 19 and 22, 2013 (full days); and July 23, 2013 (full day). *See* Dkt. No. 55-1 at ¶¶ 57-71. On July 19, 2013, Owens faxed a note to Donna Guttman listing a number of Plaintiff's absences and partial days since February 2013, and also discussed Plaintiff's planned absences on July 19 and 22, 2013. *See id.* at ¶¶ 71-72.

Plaintiff emailed Guttman on July 23, 2013 to inform Guttman that her grandmother had died and indicated that she would not be returning to work until July 29, 2013. *See id.* at ¶ 73. Then, early on July 24, 2013, Plaintiff called Owens to tell her that she would not be in that day or the rest of the week because her grandmother had died. *See id.* at ¶ 74. According to Plaintiff, Owens responded by saying "'this is fucking bullshit'" and then hung up the phone. *See id.*

Including the time off from July 24 to July 26, 2013 due to her grandmother's passing, since April 23, 2013 Plaintiff had missed all or part of a workday on twenty-nine occasions. *See* Dkt. No. 55-1 at ¶ 75. According to Plaintiff's phone records, during the times when she was clocked in at work from June 6 to July 9, 2013, she sent 491 text messages, which is an average of 29 text messages per workday. *See id.* at ¶ 77.

On July 23, 2013, Owens called Guttman to inform Guttman that the previous Thursday, July 18, 2013, an employee had reported to the medical office stating that he had chest pains the evening before and that instead of taking any emergency action, Plaintiff had scheduled the employee for an appointment for Tuesday, July 23, 2013. *See id.* at ¶ 78. This issue only came to Owens' attention on July 23, 2013 when Owens learned the employee had come in the previous week complaining of chest pains. *See id.* at ¶ 79. At her deposition, Plaintiff admitted that the proper course of action for an employee complaining of having chest pains the evening before would be to send the employee to the emergency room. *See id.* at ¶ 80.

On July 24, 2013, Owens called Guttman to inform her about Plaintiff taking off for the remaining of the week through July 26, 2013 due to her grandmother's passing. *See id.* at ¶ 81. At this point, Owens indicated that Plaintiff would no longer be permitted access to the Selkirk site. *See id.* In August of 2013, Defendant Concentra terminated Plaintiff. *See id.*

On May 24, 2014, Plaintiff, through her attorney Matthew Porges, filed a charge with the Equal Employment Opportunity Commission ("EEOC"). *See* Dkt. No. 55-1 at ¶ 85. On the charge, Mr. Porges' address is listed as 641 President Street, Suite 205, Brooklyn, New York 11215. *See id.* at ¶ 86. Mr. Porges had been operating out of his office at 641 President Street since October 2012, over a year-and-a-half before filing the EEOC charge. *See id.* at ¶ 87. On

the charge, Plaintiff's address is listed as 728 Femabush Road, Delmar, New York 12054. *See id.* at ¶ 88; Dkt. No. 52-2 at 259.

On October 13, 2014, through her attorney, Plaintiff requested a Notice of Right to Sue from the EEOC. *See id.* at ¶ 89. On the October 13, 2014 letter, Mr. Porges' address was listed as 641 President Street, Suite 205, Brooklyn, New York 11215. *See id.* at ¶ 90. Defendants claim that, on October 31, 2014, the EEOC mailed a Notice of Right to Sue to Plaintiff at 728 Femabush Road, Delmar, New York 12054, and to her attorney Matthew Porges at 641 President Street, Suite 205, Brooklyn, New York 11215. *See id.* at ¶ 91. Plaintiff, however, claims that the "Right to Sue Letter was not actually sent at that time." *See id.* (citing Plaintiff's Exhibit G, ¶ 9). Although Plaintiff acknowledges that she received the October 31, 2014 Notice of Right to Sue, she does not recall exactly when she received it. *See id.* at ¶ 93. Mr. Porges, however, claims that he never received the October 31, 2014 letter. Rather, according to Mr. Porges, on October 13, 2014, he requested that the EEOC issue Right to Sue Letters in this matter and one other case. *See* Dkt. No. 55-3 at 40-41. In mid-December 2014, when he had not received the Right to Sue letters in both cases, Mr. Porges emailed the EEOC to inquire into their statuses. *See id.* Thereafter, the EEOC issued two new Right to Sue Letters, dated March 27, 2015 and Plaintiff commenced this action on May 27, 2015. *See id.*; *see also* Dkt. No. 1.

### III. DISCUSSION

**A.    Standard**

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994) (citations omitted). When analyzing a summary judgment motion, the

6

court "cannot try issues of fact; it can only determine whether there are issues to be tried." *Id.* at 36-37 (quotation and other citation omitted). Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleading. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56(c), (e)).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers*, 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)) (other citations omitted). Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of New York*, 322 F.3d 139, 143 n.5 (2d Cir. 2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

**B.   Withdrawn Claims**

In her response to Defendants' motions for summary judgment, Plaintiff has withdrawn her claims under the FMLA and her retaliation claims. *See* Dkt. No. 55 at 6. In light of Plaintiff's acknowledgment that her retaliation and FMLA claims are subject to dismissal, the Court grants Defendants' motions as these claims.

**C.   Statute of Limitations**

In their motions, Defendants contend that Plaintiff's claims under Title VII and the ADA are untimely because Plaintiff failed to file her lawsuit within ninety days of her receipt of the EEOC's Notice of Right to Sue letter. *See* Dkt. No. 52-3 at 9-11; Dkt. No. 51-7 at 17-19. Defendants claim that, although Plaintiff admits that she received the EEOC's October 31, 2014

Notice of Right to Sue, she did not file her complaint until May 27, 2015. *See id.* Defendants argue that the statute of limitations runs from the date that a right-to-sue letter is first received by either the claimant or by her counsel, whichever is earlier. *See* Dkt. No. 52-3 at 10 (quoting *Tiberio v. Allergy Asthma Immunology of Rochester*, 664 F.3d 35, 38 (2d Cir. 2011)). Since it is presumed that a right-to-sue letter is received three days after it is mailed, Plaintiff's complaint is untimely. *See id.*

In response, Plaintiff argues that nothing in the record establishes when she received the actual right-to-sue letter. *See* Dkt. No. 55 at 13. During her deposition, Plaintiff made clear that she was unsure how soon after October 31, 2014 she received the letter. *See id.* As such, Plaintiff contends that "Defendants have absolutely no evidence that Plaintiff actually received the initial Right to Sue letter within the initial ninety day RTS period. Instead, Defendants based their entire statute of limitations defense on speculation that Plaintiff intentionally, recklessly, or negligently missed the ninety day deadline and, upon doing so, then sought a new RTS letter." *Id.* Further, Plaintiff contends that, when counsel emailed the EEOC in mid-December 2014 to learn the status of the requested right-to-sue letter, the ninety-day statute of limitations had not yet expired for the original letter. *See id.* As such, Plaintiff argues that "there would be absolutely no reason for Plaintiff to seek a new RTS letter if she or her counsel actually had the original Right to Sue Letter." *Id.*

To be timely, claims under the ADA or Title VII must be filed within ninety days of the "claimant's receipt of a right-to-sue letter from the EEOC." *Tiberio v. Allergy Asthma Immunology of Rochester*, 664 F.3d 35, 37 (2d Cir. 2011) (citing 42 U.S.C. § 2000e–5(f)(1); 42 U.S.C. § 12117(a)). Absent proof to the contrary, it is presumed that a right-to-sue letter is mailed on the date shown on the notice, and "received three days after its mailing." *Id.*; *see also*

8

*Sherlock v. Montefiore Med. Ctr.*, 84 F.3d 522, 526 (2d Cir. 1996) ("If a claimant presents sworn testimony or other admissible evidence from which it could reasonably be inferred either that the notice was mailed later than its typewritten date or that it took longer than three days to reach [him] by mail, the initial presumption is not dispositive").

In the present matter, the Court finds that Plaintiff's complaint was untimely. Although Plaintiff admits that she received the EEOC's October 31, 2014 right-to-sue letter, she claims that her Title VII and ADA claims are not time-barred because "she could not identify and did not identify whether she received it within ninety (90) days of its issuance." Dkt. No. 55 at 10. In her deposition, Plaintiff testified as follows:

> Q. I'm going to show you what's been marked as Exhibit 18. Have you seen this document before?
>
> A. Yeah. This got mailed to my house.
>
> Q. So you received a copy of this document which –
>
> A. Couple of documents got sent to my house.
>
> \* \* \* \*
>
> Q. And this document, this October 31st, 2014, that was forwarded to your P O box?
>
> A. Yes. I got this through the mail.
>
> Q. At your P O box?
>
> A. Yeah.
>
> Q. But you don't know how soon after October 31st, 2014 you received it?
>
> A. No. I didn't like keep dates.
>
> Q. So you don't recall?
>
> A. Don't recall.

9

Dkt. No. 50-2 at 48, 50.

Despite this testimony, Plaintiff's counsel makes various baseless excuses as to why Plaintiff's complaint was untimely filed, including claiming that Plaintiff could not recall when she received the EEOC's right-to-sue letter dated October 31, 2014 and that he never even received the document. Plaintiff's arguments, unsupported by any evidence, is insufficient to rebut the three-day presumption. *See Edwards v. Onondaga Cmty. Coll.*, No. 5:14-cv-1329, 2015 WL 7283187, *4 (N.D.N.Y. Nov. 16, 2015) (holding that "it is not enough to rebut the three-day presumption if a plaintiff only presents evidence showing either their 'own lack of recollection' or a 'mere denial of receipt'") (quoting *Sherlock*, 84 F.3d at 526) (other citations omitted); *Hughes v. Elmira Coll.*, 584 F. Supp. 2d 588, 590 (W.D.N.Y. 2008) (same). Here, Plaintiff's lack of recollection as to when she received the right-to-sue notice is insufficient.

Further, it is well settled that "the 90-day limitations period set forth in 42 U.S.C. § 2000e-5(f)(1) begins to run on the date that a right-to-sue letter is first received by either the claimant or by counsel, whichever is earlier. *See Tiberio*, 664 F.3d at 38 (citations omitted). Here, Plaintiff acknowledges having received the October 31, 2014 right-to-sue letter and presents no evidence to rebut the three-day presumption. Although the Second Circuit has noted "the possibility of a different outcome where counsel requests service in lieu of service on the claimant," as in *Tiberio* "there is no record of such a request in this case." *Id.*

Although in certain circumstances the Court could equitably toll the ninety-day statute of limitations, Plaintiff has not even requested that the Court grant this extraordinary relief. Even had Plaintiff made such an argument, nothing in the record supports granting such a request. The doctrine of equitable tolling "permits courts to extend a statute of limitations on a case-by-case basis to prevent inequity." *Warren v. Garvin*, 219 F.3d 111, 113 (2d Cir. 2000) (citing *Johnson v.*

*Nyack Hosp.*, 86 F.3d 8, 12 (2d Cir. 1996) (additional citations omitted). Equitable tolling applies only in "'rare and exceptional circumstance[s].'" *Martinez v. Superintendent of E. Corr. Facility*, 806 F.3d 27, 31 (2d Cir. 2015) (quoting *Smith v. McGinnis*, 208 F.3d 13, 15 (2d Cir. 2000)). To determine whether equitable tolling is available, a court must decide whether the party attempting to invoke the doctrine "(1) has acted with reasonable diligence during the time period she seeks to have tolled, and (2) has proved that the circumstances are so extraordinary that the doctrine should apply." *Zerilli-Edelglass v. New York City Transit Auth.*, 333 F.3d 74, 80-81 (2d Cir. 2003) (quoting *Chapman v. Choicecare Long Island Term Disability Plan*, 288 F.3d 506, 512 (2d Cir. 2002)). "As a unanimous Supreme Court recently 'reaffirm[ed],' 'the second prong of the equitable tolling test is met only where the circumstances that caused a litigant's delay are both extraordinary and beyond its control.'" *Haygood v. ACM Med. Lab., Inc.*, 642 Fed. Appx. 27, 28 (2d Cir. 2016) (quoting *Menominee Indian Tribe of Wisc. v. United States*, ___ U.S. ___, 136 S. Ct. 750, 756 (2016)) (other citation omitted). The party seeking to extend the limitations period bears the burden of proving that tolling is appropriate. *See Chapman*, 288 F.3d at 512 (citing *Boos v. Runyon*, 201 F.3d 178, 185 (2d Cir. 2000)).

The only argument potentially applicable to the question of whether Plaintiff is entitled to equitable tolling is the reliance on the second right-to-sue letter dated March 27, 2015. In the Second Circuit, whether a plaintiff is entitled to equitable tolling because she received successive right-to-sue letters from the EEOC depends on the specific facts of the case. For example, where a plaintiff deliberately procures the second right-to-sue notice for the sole purpose of avoiding the statute of limitations, the lawsuit will be barred as untimely. *See Lo v. Pan Am. World Airways, Inc.*, 787 F.2d 827, 828 (2d Cir. 1986). On the other hand, courts have equitably tolled the ninety-day deadline where a plaintiff was understandably confused by successive EEOC

11

right-to-sue letters. *See e.g., Brown*, 2013 WL 4009795, at *6. This often occurs where the plaintiff has simultaneously filed an identical complaint with the EEOC and the New York State Division of Human Rights ("NYSDHR"). *Id.* (finding equitable tolling appropriate because of "the reasonable confusion caused by the EEOC and NYSDHR dual filing and review process"); *Ghosh v. New York City Dep't of Health*, 413 F. Supp. 2d 322, 330 (S.D.N.Y. 2006) (holding that the plaintiff was entitled to equitable tolling where "he was, understandably, confused by the dual processing of his case by both agencies").

Nothing in the present matter presents the type of extraordinary circumstances warranting equitable tolling. Although there is no indication here that Plaintiff sought the second right-to-sue letter in a deliberate attempt to get around the statutory time limits, the fact that Plaintiff did not engage in the type of "chicanery" found in *Lo* is insufficient to meet the requirements for equitable tolling. *See Reyes v. N. Shore Long Island Jewish Health Sys.*, No. 00-cv-6400, 2002 WL 31180961, *2 (E.D.N.Y. Oct. 2, 2002) (citing *Lo*, 787 F.2d at 828).

It is true that Mr. Porges inquired as to the status of the right-to-sue letter on December 18, 2014. *See* Dkt. No. 55-3 at 28. After several emails, the final email sent to Mr. Porges from the EEOC, dated December 24, 2014, simply states "Can you please e-mail me copies of the letters? Thanks JBD." *Id.* at 27. Nothing in the record indicates that Mr. Porges further inquired as to the status of this case with the EEOC, despite the fact that the EEOC did not send the second right-to-sue letter until March 27, 2015. The law is clear that garden variety mistakes by attorneys, excusable neglect, and simple negligence are insufficient to warrant the application of equitable tolling. *See Holland v. Florida*, 560 U.S. 631, 651-53 (2010).

Based on the foregoing, the Court grants Defendants' motions for summary judgment as to Plaintiff's Title VII and ADA claims.

**D.      Merits**

*1. Title VII*

Title VII "makes it unlawful for an employer to discriminate against any individual with respect to the 'compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'" 42 U.S.C. § 2000e–2(a)(1); *Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003).  Disparate treatment discrimination claims are analyzed using familiar burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973).  Claims under the NYSHRL are governed by the same standards and will have the same outcome as claims analyzed under Title VII.  *See* 42 U.S.C. § 2000(e); 29 U.S.C. § 621 *et seq.*; N.Y. Exec. Law § 296 *et seq.*; *see also Salamon v. Our Lady of Victory Hosp.*, 514 F.3d 217, 226 n.9 (2d Cir. 2008) ("We typically treat Title VII and NYSHRL discrimination claims as analytically identical, applying the same standard of proof to both claims").

The Pregnancy Discrimination Act ("PDA"), which is an amendment to Title VII, incorporates "women affected by pregnancy" into the definition of prohibited gender-based discrimination, 42 U.S.C. § 2000e(k), and requires that pregnant employees not be treated differently from other employees.  A plaintiff may establish a *prima facie* case of discrimination under the PDA provisions of Title VII by demonstrating: (1) that she was within the protected group; (2) she was performing her duties satisfactorily; and (3) she suffered an adverse employment action (4) under circumstances giving rise to an inference of discrimination.  *See Kerzer v. Kingly*, 156 F.3d 396, 401 (2d Cir.1998) (citation omitted); *see also Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000) (citation omitted).

13

Once the plaintiff presents a *prima facie* case, the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for its employment decision. *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981). Upon the defendant's articulation of a legitimate, non-discriminatory reason, the presumption of discrimination arising from the plaintiff's *prima facie* showing "'drops out of the picture.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993)); *see also Weinstock v. Columbia Univ*, 224 F.3d 33, 42 (2d Cir. 2000). The Second Circuit described the plaintiff's burden at this third stage of the *McDonnell Douglas* framework as follows:

> The plaintiff must produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, nondiscriminatory reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason for the employment action. In short, the question becomes whether the evidence, taken as a whole, supports a sufficient rational inference of discrimination. To get to the jury, it is not enough to disbelieve the employer; the factfinder must also believe the plaintiff's explanation of intentional discrimination.

*Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000) (internal citations and alterations omitted); *see also Kirkland v. Cablevision Systems*, 760 F.3d 223, 225 (2d Cir. 2014) (citation omitted).

In the present matter, even assuming that Plaintiff has met the minimal burden of establishing her *prima facie* case, the undisputed facts do not support a sufficient rational inference of discrimination. Rather, the evidence demonstrates that, in the months leading up to her termination, Plaintiff was regularly absent from work. As discussed above, including the time off from July 24 to July 26, 2013, since April 23, 2013, Plaintiff had missed all or part of a workday on twenty-nine occasions. *See* Dkt. No. 55-1 at ¶ 75. Further, while she was at work,

14

Plaintiff spent a considerable amount of time on her cell phone. On June 5, 2013, the date that Owens called Guttman about Plaintiff's phone use, Plaintiff sent 144 text messages while at work. *See id.* at ¶ 56. Further, Plaintiff's phone records indicate that, during the times when she was clocked in at work from June 6 to July 9, 2013, she sent 491 text messages, which is an average of 29 text messages per workday. *See id.* at ¶ 77. Additionally, as discussed above, Plaintiff admits that, when an employee came to the medical office on July 18, 2013 complaining of chest pain, she failed to direct him to go to the emergency room immediately, in violation of company policy. *See id.* at ¶¶ 78-79.

Based on the foregoing, the Court finds that Plaintiff has failed to put forth sufficient evidence that would permit a rational jury to find that Plaintiff was subjected to discrimination in violation of Title VII. Rather, the undisputed facts demonstrate that Plaintiff was terminated because of her poor work performance and a lengthy history of attendance issues. Accordingly, Defendants' motions for summary judgment are granted as to Plaintiff's Title VII and PDA causes of action on this alternative ground.

### *2. The ADA*

The ADA prohibits "discrimination against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). To establish a *prima facie* case of discrimination under the ADA, a plaintiff must show that: "(1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered adverse employment action

because of his disability." *Sista v. CDC Ixis North America, Inc.*, 445 F.3d 161, 169 (2d Cir. 2006) (citing *Giordano v. City of New York*, 274 F.3d 740, 747 (2d Cir. 2001)).

As this claim arises after January 1, 2009, the ADA Amendment Act of 2008 ("ADAAA") governs the analysis. It is clear that the ADAAA "substantially broadened the definition of a disability" in response to Supreme Court decisions that strictly defined the term "disability" under the ADA. *See Wanamaker v. Westport Bd. of Educ.*, 899 F. Supp. 2d 193, 210 (D. Conn. 2012) (quoting *Hutchinson v. Ecolab, Inc.*, No. 3:09cv1848, 2011 WL 4542957, *7 (D. Conn. Sept. 28, 2011)). "Disability" is defined as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individuals; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1). The ADAAA enlarged the interpretation of the ADA's three-category definition of "disability." For example, "'major life activity' [under the first definition of disability now] includes 'caring for oneself, performing manual tasks ... walking, standing, lifting, bending, speaking, breathing, ... and working,' as well as 'the operation of a major bodily function,' including 'neurological, brain, respiratory, circulatory, endocrine, and reproductive functions.'" *Wanamaker*, 899 F. Supp. 2d at 210 (quoting *Hutchinson*, 2011 WL 4542957, at *8).

"EEOC regulations implementing the ADAAA, although having no binding effect on this Court, are 'useful to understanding the intended meaning of the Amendments.'" *Wanamaker*, 899 F. Supp. 2d at 210 (internal quotation marks and citations omitted). The EEOC regulations provide that under the ADAAA, an impairment is a disability within the meaning of the statute where "it substantially limited the ability of an individual to perform a major life activity as compared to most people in the general population. An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to

16

be considered substantially limiting." 29 C.F.R. § 1630.2(j)(1)(ii). The regulations further clarified that "[a]n impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active." 29 C.F.R. § 1630.2(j)(1)(vi). Accordingly, "'temporary, non-chronic impairments of short-duration, with little or no longer term or permanent impact, are usually not disabilities.'" *Wanamaker*, 899 F. Supp. 2d at 211 (quotation and other citations omitted); *see also Green v. N.Y. City Health & Hosp. Corp.*, No. 04cv5144, 2008 WL 144828, *4 (S.D.N.Y. Jan. 15, 2008) ("To establish a disability under the ADA, there must be some proof of permanency"). Even after the ADAAA, courts in the Second Circuit have held that short-term impairments do not

> render a person disabled within the meaning of the statute. EEOC interpretive guidance explains that the "effects of an impairment lasting or expected to last fewer than six months can be substantially limiting within the meaning of this section" however "[t]he duration of an impairment is one factor that is relevant in determining whether the impairment substantially limits a major life activity. Impairments that last only for a short period of time are typically not covered, although they may be covered if sufficiently severe."

*Wanamaker*, 899 F. Supp. 2d at 211 (quoting 29 C.F.R. pt. 1630, App.).

Given these parameters, "[p]regnancy does not typically constitute a disability under the ADA." *Wanamaker*, 899 F. Supp. 2d at 211 (quoting *Sam–Sekur v. Whitmore Group, Ltd.*, No. 11-cv-4938, 2012 WL 2244325, *7-*8 (E.D.N.Y. June 15, 2012) (collecting cases); *see also Kucharski v. Cort Furniture Rental*, 536 F. Supp. 2d 196, 202 (D. Conn. 2007), *rev'd on other grounds on reconsideration*, 594 F. Supp. 2d 207 (D. Conn. 2008), *aff'd*, 342 Fed. Appx. 712 (2d Cir. 2009).

In the present matter, the Court finds that Plaintiff has failed to establish that she was disabled within the meaning of the ADA or that she suffered an adverse employment action

because of her alleged disability. Plaintiff relies almost exclusively on generalized statements based on EEOC guidance and the ADA's definition of disability to argue that her high-risk pregnancy was a disability. The only evidence that Plaintiff presented in support of her position that her high-risk pregnancy was a disability is the fact that her doctor diagnosed her with a high risk pregnancy. Plaintiff does not claim that her high risk pregnancy substantially limited in any way her reproductive functions or any other major life activity. Nor does Plaintiff claim that there was any impact on her ability to perform the essential functions of her position as a medical assistant. Rather, Plaintiff testified that her pregnancy was considered high risk "because of all the pregnancies [she previously] had[.]" Dkt. No. 50-2 at 54.[1] Nothing in the record supports that Plaintiff's pregnancy impacted her ability to perform a major life activity or that she was regarded as having such a disability.

Moreover, the Court also finds that, even assuming Plaintiff had a disability within the meaning of the ADA, the undisputed facts establish that she was not terminated because of her disability. Rather, Plaintiff was terminated because she had an exceedingly high number of absences from work (that were not related to her pregnancy). Further, the record also establishes that, even when Plaintiff was at work, she spent an incredible amount of time on her personal cell phone. Additionally, immediately prior to her exclusion from the Selkirk site, Plaintiff failed to properly address a patient who had come to medical facility complaining of chest pains. Moreover, Defendants Guttman and Owens both testified that they had several discussions regarding Defendant Owens' issues with Plaintiff's performance at work and excessive absences between February and June of 2013, well before Plaintiff discovered that she was pregnant.

---

[1] Although the medical staff at the fertility clinic designated her pregnancy as high risk, Plaintiff's OBGYN, Dr. Kelsey, did not believe that Plaintiff was a high-risk pregnancy. *See* Dkt. No. 50-2 at 54.

18

Accordingly, the Court finds that Defendants have met their burden of establishing that Plaintiff's termination was for legitimate, non-discriminatory reasons.

Finally, even assuming that Plaintiff satisfied her *prima facie* burden, she has failed to put forth any evidence from which a reasonable jury could determine that it is "more likely than not the employer's decision was motivated, at least in part, by a discriminatory reason." *Forde v. Beth Israel Med. Ctr.*, 546 F. Supp. 2d 142, 150 (S.D.N.Y. 2008) (citation omitted). "'While timing may be sufficient to establish an inference of discrimination' at the first, *prima facie* stage of *McDonnell Douglas*, 'the close proximity of a termination to the plaintiff's announcement of her pregnancy alone is insufficient to demonstrate a pretext.'" *Id.* (quotation omitted); *see also Ramsaran v. Booz & Co. (N.A.) Inc.*, No. 1:14-cv-708, 2015 WL 5008744, *12 (S.D.N.Y. Aug. 24, 2015) (holding that, in the absence of any other evidence of the defendants' discriminatory intent, the plaintiff's "feelings about her discharge are not sufficient for plaintiff to meet her burden to come forward with evidence of discrimination. If a bare affirmation that a plaintiff 'felt discriminated against' was sufficient to defeat summary judgment, summary judgment in employment discrimination cases would be rare").

Based on the foregoing, the Court grants Defendants' motions for summary judgment as to Plaintiff's ADA claims.

### *3. NYSHRL Claims*

Since Plaintiff's gender and disability discrimination claims are analyzed under the same standards applicable to Title VII and the ADA, for the reasons set forth above, Plaintiff's state-law discrimination claim are dismissed. *See Knox v. Town of Southeast*, 599 Fed. Appx. 411, 415 n.3 (2d Cir. 2015); *Holt v. Crossmark/Sam's Club*, No. 2013 WL 3282886, *4 (W.D.N.Y. June 27, 2013) (citation omitted).

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendants' motions for summary judgment (Dkt. Nos. 50 & 52) are **GRANTED**; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendants' favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: August 15, 2017
      Albany, New York

                                               Mae A. D'Agostino
                                               U.S. District Judge